**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

JIM BEATON,

                                    CV 08-25-M-RFC-JCL

                Plaintiff,

                                    FINDINGS & RECOMMENDATION
                                    OF UNITED STATES
                                    MAGISTRATE JUDGE

      vs.

FIRST NATIONAL BANK OF
MONTANA, INC.,

                Defendant.

_____

This whistleblower action for retaliatory, wrongful discharge comes before the Court on the Defendant's motion for summary judgment.  For the reasons set forth below, the motion should be granted .

## I.  Background[1]

_____

[1] Consistent with well-established summary judgment standards, the following facts are viewed in the light most favorable to the Plaintiff as the non-moving party.

In the fall of 2004, Defendant First National Bank of Montana, Inc. ("First National") was searching for a new Missoula Branch President. Def.'s State. of Undisputed Facts ¶ 3 (Feb. 27, 2009). As part of that process, First National's President and Chief Executive Officer, William Partain ("Partain") interviewed Plaintiff Jim Beaton ("Beaton") for the position. Def.'s SUF ¶ 5; Pl.'s State. Genuine Issues ¶ 1 (Apr. 17, 2009). First National hired Beaton, and he began working in February 2005. Def.'s SUF ¶ 13; Pl.'s SGI ¶ 4.

Shortly thereafter, Beaton learned that First National Board of Directors ("Board") member Tom Swenson ("Swenson") owned and operated the Montana Business Capital Corporation ("Montana Business Capital"), a loan brokerage business with offices in one of First National's Missoula buildings.[2] Pl.'s SGI ¶ 8-10. Beaton became concerned about the propriety of Montana Business Capital's relationship with First National. In the Spring of 2005, Beaton discussed those concerns with his superiors, Partain and corporate executive vice president Tom Giblin. Pl.'s SGI ¶ 23-25; Def.'s SUF ¶ 20.

Others apparently shared those concerns, as evidenced by the fact that the Office of the Comptroller of the Currency ("OCC"), which is the federal

---

[2] The Missoula building housed First National's Higgins Avenue branch and its corporate headquarters. Pl.'s SGI ¶ 10.

regulatory oversight agency charged with jurisdiction over federally-chartered banks, had previously investigated Montana Business Capital's relationship with First National on two occasions.  Def.'s SUF ¶ 18.  According to Giblin, the OCC found nothing wrong with the relationship, so long as all dealings between the two entities remained arms-length transactions.  Depo. John Giblin Jr. 61:1-8 (Feb. 13, 2009).

On April 28, 2005, the Board held a re-organizational meeting during which it named several individuals, including Beaton, as officers for the year 2005. Depo. Jim Beaton Ex. 3 (Aug. 20, 2008).  Some six months later, Joe Kesler ("Kesler") replaced Partain as First National's President and CEO.  Def.s SUF ¶ 28; Pl.'s SGI ¶ 29.  Soon after Kesler assumed that position in October 2005, he too learned of First National's relationship with Montana Business Capital and sought additional information from several bank employees, including Beaton. Depo. Joe Kesler ¶ 53:22-55:6 (Feb. 12, 2009).

In December 2005, First National hired Professional Bank Services to investigate and report on the situation involving Montana Business Capital.  Def.'s SUF 30.  In January 2006, Professional Bank Services issued a report that was critical of First National's relationship with Montana Business Capital.  Def.'s SUF ¶ 35.  Sometime within the next few months, Swenson resigned from the

Board, and Montana Business Capital moved out of the First National building. Def.'s SUF ¶ 35; Pl.'s SGI ¶ 31.

The OCC conducted a routine examination of First National in late 2006, and learned of Professional Bank Service's investigative report. Def.'s SUF ¶¶ 49, 53. As a part of its follow-up investigation, the OCC spoke to several First National employees identified by Kesler as having information about Montana Business Capital, including Beaton. Def.'s SUF ¶¶ 54-55. An OCC examiner interviewed Beaton on December 20, 2006. Pl.'s SGI 46.

On January 11, 2007, Beaton arrived late for a loan committee meeting First National expected him to attend. According to Beaton, his absence was due to the fact that he never received notice of the meeting. Def.'s SUF ¶¶ 67-70; Pl.'s SGI ¶¶ 80-92. Shortly thereafter, Beaton received a year-end performance scorecard which indicated the Missoula Branch's actual performance was falling short of its goal performance in several areas. Def.'s SUF ¶ 71; Depo. Beaton Ex. 22.

On February 7, 2007, Kesler and Giblin conducted Beatons' calendar year 2006 performance review. Def.'s SUF ¶ 74; Pl.'s SGI ¶ 100. The review included a written performance evaluation, which identified Beatons' various strengths and accomplishments and detailed several areas of concern as well. Def.'s SUF ¶ 74; Depo. Beaton Ex. 21. The review indicated that First National was placing Beaton

"on a three-month probationary period to demonstrate improvement in personal load production, and leadership by example." Depo. Beaton Ex. 21. Beaton signed the review one week later, and returned it to Kesler with a handwritten comment indicating "[i]t seems fruitless to recommunicate the many misunderstandings and conflicts that have arisen at the bank only to have them ignored again." Pl.'s SGI 119; Depo. Beaton Ex. 21.

After Kesler received Beaton's response, he discussed the matter with First National's human resources director and then went to speak with Beaton. Pl.'s SGI ¶ 120; Def.'s SUF ¶¶ 80-81. Because he believed Kesler was angry, Beaton indicated he did not want to discuss the matter at that time. Def.'s SUF 81; Pl.'s SGI ¶ 120. Beaton also declined to discuss the matter with First National's human resources director, Bob Robertson. Def.'s SUF ¶ 83; Pl.'s SGI ¶ 121. Kesler decided he would recommend that the Board discharge Beaton, and on February 19, 2007, placed Beaton on paid administrative leave until the Board could review the situation. Def.'s SUF ¶ 88. On February 23, 2007, the Board voted unanimously to terminate Beaton's employment. Def.'s SUF ¶ 90; Depo. Beaton Ex. 27.

Beaton commenced this action in February 2008, asserting a claim against First National for retaliatory discharge in violation of the federal banking

–5–

whistleblower statute, 12 U.S.C. § 1831j.  Compl. ¶¶ 10-13 (Feb. 21, 2008).

Beaton also brings an alternative state law claim under Montana's Wrongful

Discharge from Employment Act, alleging that  First National wrongfully

discharged him without good cause and in retaliation for his refusal to violate

public policy.  Compl. ¶ 14-16.   First National has moved for summary judgment

on all of Beaton's claims.

## II.  Summary Judgment Standards

A party moving for summary judgment bears the burden of demonstrating

"that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A movant may

satisfy that burden where the documentary evidence produced by the parties

permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251

(1986).

The party seeking summary judgment bears the initial burden of informing

the Court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, which it believes demonstrate the absence of any

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party has met its  initial burden with a properly supported

motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, at 248.

Where, as here, the nonmoving party bears the burden of proof at trial, the moving party can meet its initial burden on summary judgment by showing that there is an absence of evidence in the record to support the nonmoving party's claims. *Celotox*, 47 U.S. at 325.

## III.  Discussion

### A.  State law claim for wrongful discharge without good cause

As a threshold matter, First National moves to summarily dismiss Beaton's state law claim for wrongful discharge without good cause on federal preemption grounds.  According to First National, the National Bank Act's "dismiss-at-pleasure" provision, codified at 12 U.S.C. 24 (Fifth), preempts Beaton's claim that he was discharged without good cause in violation of Montana's  Wrongful Discharge Act (MWDA), Mont. Code Ann. § 39-2-904(1)(b).

The National Bank Act gives national banking associations the power "[t]o elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, dismiss such officer or any of them at pleasure, and

appoint others to fill their places."  12 U.S.C. § 24 (Fifth).   The Ninth Circuit has

interpreted this so-called  "dismiss-at-pleasure" provision "to mean that the board

of directors of a national bank may dismiss an officer without liability for breach

of the agreement to employ."  *Mackey v. Pioneer National Bank*, 867 F.2d 520,

524 (9th Cir. 1989).  As the *Mackey* court recognized, the purpose of § 24 (Fifth)

was to give national banking "institutions the greatest latitude possible to hire and

fire their chief operating officers, in order to maintain the public trust."  *Mackey*,

867 F.2d at 526.

  While the Act's dismiss-at pleasure provision does not preempt "the entire

field of law governing national banks' employment practices," its preemptive

scope extends to contract claims challenging a bank's dismissal of an officer, and

to certain state tort wrongful discharge claims.  *Kroske v. US Bank Corp.*, 432

F.3d 976, 982 & 984 (9th Cir. 2006); *Mackey*, 867 F.2d at 524-25.  Beaton does not

dispute the preemptive effect of the National Bank Act's dismiss-at-pleasure

provision.  He does, however, argue that First National may not invoke its

protections under the circumstances.

  According to Beaton, First National cannot rely on the dismiss-at-pleasure

provision unless the Board formally approved "both [his] hiring and [his] firing."

Pl.'s Br. in Opposition 26 (Apr. 17, 2009).  For support, Beaton relies on

*Wiskotoni v. Michigan National Bank-West*, 716 F.2d 378, 387 (6th Cir. 1983),

which involved the question of whether the plaintiff branch manager qualified as

an officer within the meaning of § 24 (Fifth).  As the *Wiskotoni* court recognized,

"[t]he terms of § 24 (Fifth), require[] that officers be appointed and dismissed by a

national bank's board of directors."  *Wiskotoni*, 716 F.2d at 387.   Because the

plaintiff "was neither appointed nor dismissed by the Bank's board," the court

concluded he did not qualify as an officer of the bank for purposes of the national

Bank Act.  *Wiskotoni*, 716 F.2d at 387.

    While it is clear that First National's Board formally terminated his

employment, Beaton argues there is no evidence that the Board was responsible

for hiring him.  As Beaton notes, First National has not produced any written

board resolution documenting the original decision to hire him as branch manager

beginning in January 2005.   First National has, however, pointed to other

evidence establishing that the Board approved Beaton's hiring.  According to

Partain's affidavit testimony, the Board members interviewed Beaton over lunch

on November 19, 2004, after which they unanimously approved his hiring.   Def.'s

SUF ¶¶ 6, 8; Aff. William Partain ¶¶ 6,7 (Feb. 27, 2009).  Beaton  does not dispute

that he met with the Board, but cannot recall when that meeting occurred.   Depo.

Beaton 47:13-23.   Partain's affidavit testimony as to the date of the Board's lunch

meeting is consistent with the other evidence of record, including a date-stamped lunch receipt and the fact that First National sent Beaton a letter outlining the terms of his employment just four days later.  Depo. Beaton Ex. 2; Aff. Partain Ex. 1.

In an attempt to refute First National's claim that the Board approved his hiring, Beaton maintains that it was Partain who told him he had the job and did not say anything about the offer being contingent on a vote by the Board. Aff. Beaton ¶ 3.  This is not sufficient to raise a genuine issue of fact.  Regardless of whether Beaton believed at the time that Partain was solely responsible for hiring him, the undisputed evidence of record reflects that the Board was likewise involved in the decision and unanimously approved hiring him as the Missoula Branch President.  Furthermore, even if the Board had not been involved in the original hiring decision, it is undisputed that the Board formally appointed Beaton as a bank officer at its April 28, 2005, reorganizational meeting.  Depo. Beaton Ex. 3.

The fact that the Board hired and appointed Beaton as an officer distinguishes this case from *Wiskotoni*, where the plaintiff was hired by the bank president without any involvement by the board of directors.  *Wiskotoni*, 716 F.2d

at 380 & 387.  To the extent Beaton argues *Wiskotoni* requires that board's

decision in any given case be documented by a written resolution, he is mistaken.

The *Wiskotoni* court simply recognized that, in order for a bank to avail itself of

the protection afforded by § 24(Fifth), its board of directors must take some sort of

formal action.  The Board's unanimous vote approving Beaton's hiring is

sufficient for these purposes.  Beaton has pointed to nothing in First National's

corporate by-laws or elsewhere requiring that such a vote be memorialized in

writing in order to be effective.

Section 24 (Fifth) simply  requires that a bank's board of directors "appoint"

bank officers and empowers the board to dismiss those  officers at pleasure.

Because there can be no dispute that the Board appointed Beaton as an officer,

First National may rely on 12 U.S.C. § 24 (Fifth).  Section 24 (Fifth) in turn

preempts Beaton's claim that he was wrongfully discharged without good cause in

violation of Mont. Code Ann. § 39-2-904(1)(b).

**B.  Retaliatory discharge under 12 U.S.C. § 1831j**

Beaton has also asserted a retaliatory discharge claim under the federal

banking whistleblower protection provision of the Financial Institution Reform

and Recovery Act of 1989, codified at 12 U.S.C. § 1831j.   That statute provides,

in pertinent part, as follows:

No insured depository institution may discharge or otherwise discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment because the employee...provided information to any Federal Banking agency...regarding

(A)    a possible violation of any law or regulation ...

by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a)(1).

Section 1831j incorporates "the legal burdens of proof that prevail under" the Whistleblower Protection Act (WPA), 5 U.S.C. § 1221(e)(1).  12 U.S.C. § 1831j(f); *Lippert v. Community Bank, Inc.*, 438 F.3d 1275, 1278-79 (11th Cir. 2006).  Under the WPA, "the employee must prove that his protected disclosure was a 'contributing factor' in the adverse personnel action." *Lippert*, 438 F.3d at 1279.  The WPA allows an employee to

demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that -

(A) the official taking the personnel action knew of the disclosure; and

(B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

5 U.S.C. § 1221(e)(1).

If the plaintiff succeeds in making "out a prima facie case of retaliation under § 1831j, the defendant must articulate, by clear and convincing evidence, a legitimate, non-discriminatory reason for the termination." *Lippert*, 438 F.3d at 1279; 5 U.S.C. § 1221(e)(2).

Here, Beaton alleges "his report to the Comptroller of the Currency was a contributing factor in the Bank's decision to discharge him," and claims that First National violated § 1381j by discharging him "in retaliation for discussing his concerns about insider activity with the Office of the Comptroller of the Currency." Compl. ¶¶ 12-13.

The National Banking Act's dismissal-at-pleasure provision does not preclude Beaton from pursuing such a whistleblower claim under § 1831j. *See Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 285 (3rd Cir. 2006); *Kroske*, 432 F.3d at 986. First National does not dispute that such claims are permissible, but takes the position that Beaton's claim fails as a matter of law on three alternate bases: (1) Beaton participated in the alleged illegal activity, which renders the protections of 12 U.S.C. § 1831j(a)(1) unavailable to him; (2) Beaton does not qualify for the whistleblower protection of 18 U.S.C. § 1831j(a)(1), and; (3) there is clear and convincing evidence establishing that First National would have discharged Beaton regardless of his conversation with the OCC examiner.

### 1.  Participation in alleged wrongdoing

First National argues that Beaton's claim under § 1831j fails as a matter of law because the undisputed evidence establishes that Beaton participated in the alleged wrongdoing that was the subject of the OCC's inquiry.  First National is correct.

12 U.S.C. § 1831j provides:

(d) Limitation

The protections of this section shall not apply to any employee who –

(1) deliberately causes or participates in the alleged violation of law or regulation; or

(2) knowingly or recklessly provides substantially false information to such an agency or the Attorney General

The undisputed evidence in this case establishes that Beaton worked on loans brokered by Montana Business Capital despite the fact that he believed the company's relationship with First National was improper.  The impropriety of the relationship was the subject of the information provided by Beaton to the OCC. Beaton learned of the relationship between the two entities "almost immediately" after he began working in January 2005.  Depo. Beaton 64:19-25.  Beaton did not believe the relationship was in First National's best interests, and began discussing his concerns with others, including Giblin and Partain, as early as the Spring of

2005.  Aff. Beaton ¶ 8.  Despite his  concern regarding an impermissible conflict of interest,  Beaton testified that he never refused to work on a Montana Business Capital deal. Depo. Beaton 68:24-69:22.  Beaton's own testimony establishes that he worked on more than one loan generated by Montana Business Capital.  Depo. Beaton 69:12-18.  And Beaton admitted that he personally profited, however slightly, from the loans generated by Montana Business Capital by virtue of First National's bonus system.  Depo. Beaton 75:7-18.

Beaton argues his limited involvement in the processing of loans generated by Montana Business Capital does not constitute the "deliberate participation" contemplated by § 1831j(d)(1).  First National contends otherwise.[3]

Neither party cites, and the Court does not find, any case construing the language of § 1831j(d)(1).  First National asserts that Beaton's conduct in working on loans involving Montana Business Capital and ultimately realizing a pecuniary benefit in the form of a bonus constitutes "deliberate participation" within the plain meaning of § 1831j(d)(1).  Beaton, however, suggests in conclusory fashion, that something more than his minimal involvement in Montana Business Capital

---

[3] At oral argument, the parties disputed whether § 1831j(d)(1) should be read to require "deliberate participation" by the employee, or simple "participation."  The Court reads the adverb deliberately as used in § 1831j(d)(1) as modifying both of the two verbs, causes and participates.

-15-

loans and receipt of a modicum of pecuniary benefit is needed to impose the limitation of § 1831j(d)(1).

Beaton cites *Hicks v. Resolution Trust Corp.*, 970 F.2d 378 (7th Cir. 1992) as identifying the type of personal wrongdoing to which the "participation" exception applies. *Hicks* is one of the few cases to address § 1831j(d). The *Hicks* case, however, is of little assistance in resolving whether Beaton's conduct constituted "deliberate participation."

In *Hicks*, the plaintiff was employed as vice president and manager of mortgage lending at Clyde Federal Savings and Loan Association, responsible for making sure that Clyde Federal complied with the Community Reinvestment Act. *Hicks*, 970 F.2d at 380. The *Hicks* court held that the plaintiff's § 1831j claim was properly dismissed on summary judgment because the record reflected that the plaintiff had participated in the alleged violations he later reported to the Federal Home Loan Bank Board (FHLBB). *Hicks*, 970 F.2d at 383. In concluding the plaintiff was a participant in Clyde Federal's alleged violations of the Community Reinvestment Act, the court emphasized the plaintiff had admitted that he signed and submitted a questionnaire to the FHLBB stating that Clyde Federal was in compliance with the Community Reinvestment Act – knowing at the time he submitted the questionnaire that Clyde Federal was in violation of the Act's

-16-

regulations. *Hicks*, 970 F.2d at 383. Contrary to Beaton's suggestion, the Court

cannot construe the language of § 1831j(d)(1) by simply comparing Beaton's

conduct to the conduct of the plaintiff in *Hicks*. Instead, the Court must undertake

to give effect to the intent of Congress in its enactment of § 1831j(d)(1) by

applying the pertinent rules of statutory construction.

In construing a statute, the Court begins with the words of the statute and

must construe them according to their plain meaning. *Walleri v. Federal Home

Loan Bank of Seattle*, 83 F.3d 1575, 1581 (9th Cir. 1996) (citation omitted). "The

preeminent canon of statutory interpretation requires [a court] to 'presume that

[the] legislature says in a statute what it means, and means in a statute what it says

there.' Thus, [the court's] inquiry begins with the statutory text, and ends there as

well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S.

176, 183 (2004).

When a statute does not define a term, a Court should construe that term in

accordance with its "ordinary, contemporary, common meaning." *San Jose

Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)

(citation omitted). Absent an indication that Congress intended a specific legal

meaning for a term, the court may look to sources such as dictionaries for a

definition. *See Muscarello v. United States*, 524 U.S. 125, 128 (1998). Of

course, a court does not limit itself to the apparent plain meaning of a statute if doing so leads to "absurd or impracticable consequences." *Natural Resource Council Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996) (citations and some internal quotations marks omitted).

The second definition of the term "deliberate" in Merriam-Websters Dictionary is: "characterized by awareness of the consequences." *Merriam-Webster's Online Dictionary*, http://www.merriam-webster.com/dictionary/deliberate[2]. "Participate," in turn, is defined as: "to take part" or "to have a part or share in something." *Merriam-Webster's Online Dicarionary,* http://www.merriam-webster.com/dictionary/participate.

Using the foregoing definitions in the application of § 1831j(d)(1), the Court concludes that Beaton deliberately participated in the alleged violation of law or regulation that was the subject of the OCC investigation.  The undisputed facts reflect that Beaton was fully aware of the improper conflict of interest which existed between First National and Montana Business Capital, as well as the consequences that could flow from that relationship.  By his own admission, Beaton took part in the making of loans brokered by Montana Business Capital. As such, Beaton is precluded by the express language of § 1831j(d)(1) from availing himself of the whistleblower protections embodied in 12 U.S.C. § 1831j.

The Court is mindful that it should ignore the plain language when a "literal interpretation would thwart the purpose of the overall statutory scheme or lead to an absurd result." *County of Santa Cruz v. Cervantes*, 219 F.3d 955, 960-61 (9th Cir. 2000) (citation omitted).  This exception to the normal rule of statutory construction is a narrow one. *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 470 (1989) (Kennedy, J. concurring).  It can hardly be argued, as Beaton attempts, that the plain language interpretation of § 1831j(d)(1) frustrates the purpose of the statutory provision.  To the contrary, the plain language interpretation advances the purpose of the statute. *See Tierney v. Kupers*, 128 F.3d 1310, 1311-12 (9th Cir. 1997) (In determining the meaning of a statutory provision, a court may consider the purpose of the statute and whether the proposed interpretation would frustrate or advance that purpose).

12 U.S.C. § 1831j was set forth in the Financial Institution Reform, Recovery, and Enforcement Act of 1989, at Title IX Subtitle C – Improving Early Detection of Misconduct and Encouraging Informants.   The plain language interpretation of § 1831j(d)(1) fosters the purpose of early detection of misconduct by making whistleblower protection unavailable to an employee who does not promptly report misconduct to the appropriate federal agency but deliberately participates in that misconduct.

While Beaton's claim under § 1831j fails as a matter of law for the reasons set forth above, in the event that the presiding judge, the Honorable Richard Cebull, disagrees with the foregoing analysis, it would then be necessary to reach First National's remaining arguments in support of summary judgment upon Beaton's § 1831j claim.  Thus, for purposes of completeness,  the Court will address those arguments at this time.

### 2.  Prima facie case

In what ultimately amounts to an attack on Beaton's ability to make out a prima facie case of retaliation under § 1831j, First National argues that Beaton cannot show that he qualifies for whistleblower protection for various reasons.

By its terms, § 1831j protects an employee who has "provided information to any Federal Banking agency...regarding...a possible violation of any law or regulation...by the depository institution or any director, officer, or employee of the institution."  12 U.S.C. § 1831j(a)(1).  As First National notes, the record reflects that Beaton approached his supervisors with concerns about Montana Business Capital on more than one occasion.  Def.'s SUF ¶ 20.  While First National does not dispute that Beaton thus questioned the propriety of Montana Business Capital's relationship with the bank, it maintains that such internal reports do not fall within the scope of  § 1831j.   First National is correct.  To the

extent Beaton simply reported his concerns to Partain and Giblin, Beaton cannot be said to have provided information to a Federal Banking agency.  *See e.g. Walleri v. Federal Home Loan Bank of Seattle*, 83 F.3d 1575, 1581-82;  *Lippert v. Community Bank, Inc.*, 438 F.3d 1275, 1280 (11th Cir. 2006) (concluding that an employee's "internal reports are not protected disclosures under § 1831j(a)(1)"). Beaton's internal reports to his supervisors are not protected conduct under § 1831j.

Unlike those internal discussions, however, Beaton's conversation with the OCC examiner who was investigating First National's relationshipwith Montana Business Capital could well be protected.  There is no dispute that the OCC is a Federal Banking agency within the meaning of § 1831j.  Nor is there any dispute that Beaton spoke with the OCC examiner on December 20, 2006 as a part of the agency's investigation.  Pl.'s SGI ¶ 46; Def.'s SUF ¶ 58.

First National nevertheless argues that Beaton cannot claim whistleblower protection based on that meeting because he played no role in initiating the OCC's investigation.  But First National cites no authority for the proposition that the employee must be the moving force behind the agency's investigation.  By its terms § 1831j(a)(1) affords whistleblower protection to any employee who "provide[s] information to any Federal Banking agency...regarding...a possible

violation of any law or regulation" by the bank. The statute does not require that

the employee be the one to initiate contact, and there is nothing in the statute that

would preclude an employee who cooperates in an ongoing investigation from

receiving protection.   Thus, while it is undisputed that Kesler was the moving

force behind the Professional Bank Services report that ultimately led to the

OCC's investigation, that fact is of little consequence.  Under the terms of § 1831j,

Beaton may make out a prima facie case of retaliation if he can show that he

disclosed information to the OCC examiner regarding possible illegal activity by

the bank, and that disclosure was a contributing factor in the bank's decision to

discharge him.

Focusing next on the nature of the information disclosed,  First National

takes the position that Beaton did not actually provide the OCC with any

information it did not already have as a result of its prior investigations and

Professional Bank Services' report.  According to Beaton, however, it is sufficient

for purposes of § 1831j protection that he shared information regarding possible

illegal activity.  Beaton claims to have shared several concerns with the OCC

examiner, some of which he maintains would have implicated First National and

its officers in illegal activity.  For example,  Beaton indicates he told the examiner

that First National's Board members and senior officers knew that Montana

Business Capital had access to the bank's confidential customer information. Pl.'s SGI ¶ 50; Aff. Beaton ¶¶ 16-17.[4]  Beaton also claims to have told the OCC examiner that by ignoring this activity, senior management and the board of directors had encouraged Swenson to become bolder in his activities, and that First National allowed the relationship with Montana Business Capital to continue against the best interest of the bank and its stockholders.  Pl.'s SGI ¶¶ 52-53; Aff. Beaton ¶ 16-17.

Beaton's affidavit testimony is that he thereafter advised Kesler as to the substance of his comments to the OCC examiner.  Aff. Beaton ¶ 18.  In Beaton's words,

> I specifically remember running into Mr. Kesler outside my office later on December 20, 2006, or the next day and him asking me how my interview with the OCC had gone.  I then told him, including that I had told the OCC I believed senior management and the board of directors had been complicit in Mr. Swenson's activities by allowing the relationship to continue.

Aff. Beaton ¶ 18.

_____

[4]First National mounts an evidentiary challenge to this portion of Beaton's affidavit.  Beaton's description of his conversation with the OCC examiner references the handwritten notes he prepared in anticipation of that meeting.  Aff. Beaton ¶ 17; Doc. 39-2.  First National claims that Beaton's notes are inadmissible hearsay, and argues that paragraphs 16 and 17 of Beaton's affidavit "are just efforts to repackage and avoid the hearsay issues" in his handwritten notes.  Def.'s Reply 5.  Regardless of whether Beaton's notes are themselves admissible, the disputed portion of his affidavit properly recalls his statements to the OCC examiner.

Beaton's theory is that, upon hearing the specifics of his disclosure to the OCC, Kesler and other First National "officials set in motion a chain of events" that led to him missing an important loan committee meeting, being placed on probation, and eventually being discharged.  Pl.'s Response 22.  In other words, Beaton maintains that his protected disclosure was a "contributing factor" in First National's decision to discharge him.  *Lippert*, 438 F.3d at 1279.  As Beaton notes, he may make out a prima facie case to this effect by pointing to circumstantial evidence, such as evidence that "the official taking the personnel action knew  of the disclosure" and "the personnel action occurred within a period of time that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action."  5 U.S.C. § 1221(e)(1).

First National disputes Beaton's version of events, and effectively takes the position that Beaton cannot make out a prima facie case of retaliation discrimination on this record, even by way of circumstantial evidence.  Although Beaton states in his affidavit that he advised Kesler as to the substance of his conversation with the OCC examiner, First National asserts that Beaton testified differently at his deposition.  First National maintains that difference is reflected in the following brief exchange:

Q [defense counsel]: Do you have any knowledge that Kesler was given any indication as to what you said to the OCC?

A [Beaton]: I don't.

Depo. Beaton 159:2-5.

First National argues that this portion of Beaton's deposition testimony flatly contradicts his subsequent affidavit, in which he claims to have personally advised Kesler as to the substance of his remarks to the OCC examiner.[5]  Aff. Beaton ¶ 18.  First National maintains that Beaton is bound by his deposition testimony, and cannot use his affidavit to create a factual issue.  As First National notes, Kesler has denied ever speaking to Beaton about the substance of Beaton's comments to the OCC examiner.  Depo. Kesler 88:20-89:1.  Citing Kesler's testimony, First National claims it has established that Beaton never told Kesler about the substance of his conversation with the OCC examiner.  If, as First National maintains, Beaton cannot show there is a question of fact as to whether "the official taking the personnel action knew of the disclosure," then it is difficult to see how he could establish a prima facie case of § 1831j retaliatory discharge.

---

[5] While First National took the position in briefing that Beaton should not be permitted to contradict his deposition testimony by way of a subsequent affidavit, it was not until oral argument that First National argued in any detail that Beaton's affidavit contradicts his deposition testimony on this specific point.  Because First National made this argument for the first time at oral argument, the Court allowed supplemental briefing on the issue.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9ᵗʰ Cir. 1991).  But this rule applies only in cases involving "'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267.  Before applying this so-called "sham" affidavit rule, "the district court must make a factual determination that the contradiction was actually a 'sham'." *Kennedy*, 952 F.2d at 267.

The record does not support such a finding in this case.  Significantly, First National did not directly ask Beaton at his deposition whether he had in fact told Kesler about the substance the interview.   Putting the question in the passive voice,  First National instead asked whether Beaton "had any knowledge that Kesler was given any indication as to what you said to the OCC."  Depo. Beaton 159:2-3.  Beaton could reasonably have heard that question as asking whether anyone else had, to his knowledge, advised Kesler as to the substance of Beaton's comments to the OCC.  While the question could also have prompted Beaton to reveal the conversation he claims to have had with Kesler, the fact that Beaton did not respond as First National argues he should have does not mean he is now precluded from relying on his affidavit.  Beaton's affidavit clarifies that he indeed

claims to have spoken to Kesler about the substance of his OCC interview.

Because Beaton's affidavit cannot fairly be characterized as a "sham" affidavit, his

may rely on his affidavit testimony in resisting First National's summary judgment

motion.

Taking Beaton's affidavit testimony as true, he has pointed to sufficient

evidence to raise a factual question as to whether "the official taking the personnel

action knew of the disclosure."  5 U.S.C. § 1221(e)(1).  This is in turn sufficient to

raise a factual question as to whether Beaton's alleged disclosure was a

"contributing factor" in his discharge.  5 U.S.C. § 1221(e)(2).

In so concluding, the Court has by necessity characterized the alleged

"disclosure" at issue not as the OCC interview itself, but the substance of what

Beaton said during that interview.  The interview itself was prompted by Kesler,

who expected all First National employees meeting with the OCC to cooperate and

tell the truth.  Depo. Kesler 88:10-15.  Because the undisputed evidence

establishes that Beaton was doing exactly as his employer expected by meeting

with the OCC examiner, no rational trier of fact could find that the meeting itself

was a contributing factor in his discharge.  If, however, Beaton could show that

the substance of what he said during that meeting was communicated to his

employer, then perhaps he could show that his disclosures during the meeting

played a role in his discharge.  Whether Beaton communicated the substance of his

comments during the OCC interview to his employer is a genuine issue of material

fact.

First National vigorously disputes Beaton's characterization of the events

leading up to his discharge, but for purposes of surviving summary judgment it is

sufficient that Beaton has raised a factual issue as to whether his conversation with

the OCC examiner was a contributing factor in First National's adverse

employment decision.

### 3.  Clear and convincing evidence

Even assuming Beaton can establish a prima facie case of retaliatory

discharge, First National argues his § 1831j claim should be summarily dismissed

because clear and convincing evidence establishes that First National had a

legitimate, non-discriminatory reason for discharging him.

Where a § 1831j plaintiff succeeds in making out a prima facie case of

retaliation, the burden of persuasion passes to the defendant, who must

demonstrate "by clear and convincing evidence that it would have taken the same

personnel action in the absence of [the plaintiff's] disclosure."  5 U.S.C. §

1221(e); *Frobose v. American Sav. and Loan Ass'n of Danville*, 152 F.3d 602, 614

(7th cir. 1998) (explaining that "[t]he burden shifted to the defendants is one of

persuasion, not simply one of production).   In other words, this Court must

determine "whether there [is] a question of fact outstanding as to what action

[First National] would have taken in the absence of [Beaton's] whistleblowing."

*Frobose*, 152 F.3d at 615.

As noted above, Beaton's theory is that after learning of his protected

disclosure, First National set in motion a chain of events that led to his discharge.

First National argues otherwise, of course,  and claims that the events leading up

to Beaton's discharge had nothing to do with the fact that he spoke to the OCC.

First National maintains that Beaton was discharged for several reasons, including

his various performance deficiencies and insubordination, and would have made

the same decision regardless of Beaton's statements to the OCC.   While that may

well be true,  First National has not met its burden of persuasion and shown  by

clear and convincing evidence that it would have in fact discharged Beaton

regardless of his statements to the OCC.

### C.  Retaliatory discharge under Montana's WDEA

Beaton has also advanced a claim for retaliatory discharge under Montana's

WDEA.  Specifically, Beaton alleges that First National discharged him "in

retaliation for his refusal to participate in the Bank's ongoing violation of public

policy and/or in retaliation for his report to the [OCC] about that activity."  Compl. ¶ 15(a).

The National Banking Act does not preempt Beaton's state law retaliatory discharge claim.  *See Fenno*, 192 P.2d at 230-31.   As both parties agreed at oral argument, however, if Beaton's § 1831j claim for retaliatory discharge fails as a matter of law, so too would his state law claim fail as a matter of law.  The converse is also true.  If Beaton's § 1831j claim survives summary judgment, so too would his state law claim.

Because First National is entitled to summary judgment on Beaton's federal retaliatory discharge claim, his state law claim should likewise be dismissed.

**IV.   Conclusion**

For the reasons set forth above,

IT IS RECOMMENDED that First National's Motion for Summary Judgment be GRANTED.

DATED this 8th  day of June, 2009

   /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge